1  Francis O. Scarpulla (Bar No. 41059)
   Craig C. Corbitt (Bar No. 83251)
2  Patrick B. Clayton (Bar No. 240191)
   ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
3  44 Montgomery Street -- Suite 3400
   San Francisco, CA 94104
4  Telephone:   (415) 693-0700
   Facsimile:   (415) 693-0770
5  Email:       fscarpulla@zelle.com
                ccorbitt@zelle.com
6               pclayton@zelle.com

7  [Additional Counsel Listed on Signature Page]

8  *Attorneys for Plaintiff and the Proposed Class*

9                    UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11

12 | LAURA CUTLER, Individually and on  | Case No. CV 08 3629
13 | Behalf of All Others Similarly Situated, |
14 |                    Plaintiff,       | **CLASS ACTION COMPLAINT**
15 |          v.                         | **DEMAND FOR JURY TRIAL**
16 | MATSON NAVIGATION CO., INC.;        |
   | ALEXANDER & BALDWIN, INC.;          |
17 | HORIZON LINES, LLC; and HORIZON     |
   | LINES, INC.,                        |
18 |                    Defendants.      |

---

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

# I. INTRODUCTION

1. Plaintiff Laura Cutler brings this action on behalf of herself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities in the United States, and its territories and possessions, who purchased domestic ocean shipping services between the continental United States and Hawaii ("Hawaiian Ocean Shipping") directly from a Defendant from at least four years ago to the present (the "Class Period").

2. Defendants are domestic ocean shipping liners who collectively transport millions of revenue tons of cargo each year between ports in the United States and in the United States' territories and possessions. Defendants serve routes between the West Coast and Hawaii, and they are the only competitors of each other on these routes. Plaintiff alleges that during the Class Period, Defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which Hawaiian Ocean Shipping would be sold.

3. As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class paid artificially inflated prices for Hawaiian Ocean Shipping. Such prices exceeded the amount they would have paid if the prices had been determined by a competitive market without the conspiracy.

# II. JURISDICTION AND VENUE

4. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Art (15 U.S.C. § 1).

5. This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 of the Sherman Art, as hereinafter alleged.

6. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7. Venue is proper in this judicial district because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this district, and

because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

### III. INTRADISTRICT ASSIGNMENT

8. This action arises in Alameda County because that is where a substantial part of the events that give rise to the claim occurred. Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the San Francisco Division or the Oakland Division.

### IV. THE PARTIES

**A. Plaintiff**

9. Plaintiff Laura Cutler is a resident of Westhaven, California. During the Class Period, Plaintiff purchased Hawaiian Ocean Shipping directly from one or more Defendants. As a result of the alleged conspiracy, Plaintiff was injured by reason of the antitrust violations alleged herein.

**B. Defendants**

10. Defendant Matson Navigation Company, Inc. is a Hawaii corporation with its principal place of business in Oakland, California. Matson Navigation Company, Inc. handles approximately 67 percent of the goods shipped from the West Coast to Hawaii. Matson Navigation Company, Inc. is a wholly-owned subsidiary of Defendant Alexander & Baldwin, Inc. During the Class Period, Matson sold Hawaiian Ocean Shipping to customers in the United States and its territories and possessions.

11. Defendant Alexander & Baldwin, Inc. is a Hawaii corporation with its principal place of business in Honolulu, Hawaii. Alexander & Baldwin, Inc. is a diversified corporation that provides ocean transportation services through Defendant Matson Navigation Company, Inc., the largest of its subsidiaries. During the Class Period, Alexander & Baldwin, Inc. sold Hawaiian Ocean Shipping to customers in the United States and its territories and possessions.

12. Defendant Matson Navigation Company, Inc. and Defendant Alexander & Baldwin, Inc. are collectively referred to herein as "Matson."

13. Defendant Horizon Lines, LLC is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. Horizon Lines, LLC is a wholly owned operating subsidiary of defendant Horizon Lines, Inc. During the Class Period, Horizon Lines, LLC sold Hawaiian Ocean Shipping to customers in the United States and its territories and possessions.

14. Defendant Horizon Lines, Inc. is a Delaware corporation with its principal place of business in Charlotte, North Carolina. It is publicly traded on the New York Stock Exchange. It operates as a holding company for its wholly-owned subsidiaries, including Defendant Horizon Lines, LLC. During the Class Period, Horizon Lines, Inc. sold Hawaiian Ocean Shipping to customers in the United States and its territories and possessions.

15. Defendant Horizon Lines, LLC and Defendant Horizon Lines, Inc. are collectively referred to herein as "Horizon."

C. **Agents and Co-Conspirators**

16. The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

17. Certain other persons, firms, corporations and entities have participated as unnamed co-conspirators of Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

18. At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

## V. CLASS ACTION ALLEGATIONS

19. Plaintiff brings this action on behalf of herself and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States, and its territories and possessions, who purchased domestic ocean shipping services between the continental United States and Hawaii directly from a Defendant from at least four years ago to the present. The class excludes governmental entities, Defendants, co-conspirators, other sellers or providers of domestic ocean shipping services, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

20. Plaintiff believes that there are hundreds, if not thousands, of Class members as above described, the exact number and their identities being known by Defendants.

21. The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

22. There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

    a. Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Hawaiian Ocean Shipping and/or engaged in market allocation for those services sold in the United States, and its territories and possessions.

    b. The identity of the participants in the conspiracy;

    c. The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their coconspirators in furtherance of the conspiracy;

    d. Whether the alleged conspiracy violated Section 1 of the Sherman Act;

    e. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

      f.      The effect of Defendants' conspiracy on the prices of Hawaiian Ocean Shipping sold in the United States and its territories and possessions during the Class Period; and

      g.      The appropriate measure of damages sustained by plaintiff and other members of the Class.

23. Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a direct purchaser of Hawaiian Ocean Shipping, and her interests are coincident with and not antagonistic to those of the other members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

24. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

25. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

26. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

27. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such

as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VI. TRADE AND COMMERCE

28. During the Class Period, Defendants sold substantial quantities of Hawaiian Ocean Shipping in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

29. The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

## VII. FACTUAL ALLEGATIONS

### A. Importance of Ocean Transport

30. Ocean shipping is a highly effective method of moving large quantities of non-perishable goods and raw materials. Charges for ocean carriage are calculated by revenue ton, which is the greater of the cubic measure or weight of a shipment as packed for shipping, and such charges as the following: base ocean freight, terminal handling charge, fuel surcharge, warfage Hawaii, warfage West Coast, neighbor island arbitrary, drayage, intermodal rail, and demurrage. In 2002, U.S. domestic ocean trades amounted to 196 million metric tons.

31. The shipping industry has been protected by almost all countries in the world because of the industry's importance to national security and defense, as well as international trade. Since the 1800s, ship owners have participated in liner conferences to coordinate service, exchange market information, and agree upon rates. In the international ocean shipping industry, these liner conferences, which have many cartel-like characteristics, have been exempt from the antitrust laws.

32. Unlike international ocean shipping, the exchange of market information, agreements on prices, agreements on capacity allocation decisions, and the use of each other's capacity to sell to one's own shippers, are prohibited for carriers operating domestic ocean routes.

33. The domestic ocean trade is comprised of the following three sectors: (a) noncontiguous trade between the continental United States and Puerto Rico, Alaska, Hawaii,

1  Guam, and other U.S. Pacific Islands; (b) coastwise trade along the Atlantic, Gulf, and Pacific
2  coasts, as well as trade between coasts and the St. Lawrence Seaway; and (c) intercoastal trade
3  between the Atlantic or Gulf and pacific coasts by way of the Panama Canal. This action relates
4  solely to noncontiguous trade between the continental United States and Hawaii.

5       34.    Because of its location, the State of Hawaii depends almost entirely on ocean
6  shipping to import its essential commodities like food, clothing, fuel, building materials, and
7  automobiles, as well as to export its local products like pineapple, sugar, molasses, and livestock,
8  to and from the neighbor islands, the continental United States, and various foreign countries. By
9  one estimate, 98.6 percent of all Hawaii's imports arrive by ocean shipping. In 2003, over 5
10 million metric tons of cargo was shipped in noncontiguous domestic trade with Hawaii.

11      35.    In January 2008, Pacific Business News reported that the cost of shipping goods to
12 Hawaii had risen as much as 40 percent since 2005. This was in large part a result of Defendants'
13 conspiracy as alleged herein.

14 **B.   Inferential Evidence of Cartel Activity in the Hawaiian Ocean Shipping Industry**

15      36.    The Hawaiian Ocean Shipping industry has several characteristics that facilitated a
16 conspiracy, including market concentration, ease of information sharing, homogeneity of products,
17 and significant barriers to entry.

18      37.    The Hawaiian Ocean Shipping market is a duopoly that is conducive to collusion.
19 Defendants Matson and Horizon control 96 percent of the total market for Hawaiian Ocean
20 Shipping.

21      38.    Each of the Defendants herein participates in trade association activities that have
22 provided opportunities for information sharing. For example, each of the Defendants is a member
23 of the Maritime Cabotage Task Force ("MCTF"), a lobbying group founded in 1995 to oppose
24 efforts to open the market for non-contiguous shipping. Philip Grill of Matson is the Chairman of
25 the MCTF's Board of Directors, and Chuck Raymond and Robert Zuckerman of Horizon are
26 Board members. Thus, the executives of Matson and Horizon have close relationships that have
27 fostered the conspiracy herein.

28

39. Additionally, each of the Defendants here has ready access to industry data that facilitates effectuation and monitoring of the conspiracy. For example, PIERS, which stands for Port Import Export Reporting Service, collects and distributes, for a fee, data for the maritime industry. This data includes for example, cargo quantity and unit of measure, cargo weight, and volume. This type of information within the industry has allowed Defendants to monitor their conspiracy and verify that it is working.

40. Hawaiian Ocean Shipping services are homogenous and fungible because such services are not readily substitutable with other methods of transportation. For example, shipping heavy, bulky goods via air freight is prohibitively expensive, and there obviously are no road or rail routes between the mainland United States and Hawaii.

41. There are substantial barriers to enter the Hawaiian Ocean Shipping market, including: (a) entrenched market positions by the incumbent shipping companies; (b) the high costs associated with ocean transport vessels and to build the infrastructure for those vessels; (c) the need to develop a customer base; (d) constraints on port space; and (e) restrictions imposed by the Merchant Marine Act of 1920 at 26 U.S.C. § 100 *et seq.* (commonly referred to as the "Jones Act"). These barriers facilitate the conspiracy alleged herein because they insulate existing shipping companies from new competition and perpetuate the high market concentration.

C. **The Jones Act**

42. The Jones Act is a protectionist statute that prohibits any goods "transported by water, or by land and water... between points in the United States... either directly or via a foreign port," from being shipped unless the vessel "is wholly owned by citizens of the United States for purposes of engaging in the coastwise trade" and has been issued a "certificate of documentation" or is exempt from documentation. 46 U.S.C. § 55102.

43. The purpose of the Jones Act is to protect American shipping companies. It grants an exclusive privilege to certain U.S.-made, U.S.-manned, U.S.-flagged, and U.S. Coast Guard-approved vessels to engage in ocean shipping of merchandise or goods to or from U.S. territories, possessions, or non-contiguous States. These laws are restrictive, prohibiting all other vessels,

such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels, from engaging in this trade.

44. The Jones Act's restriction on the carriage of domestic cargoes to U.S.-made, U.S.-flagged, U.S.-crewed, and U.S.-owned ships, combined with the relatively small size of these trade routes, resulted in an essentially duopolistic Hawaiian Ocean Shipping market.

45. The Jones Act, however, provides no immunity to Defendants for their collusion, market sharing, and/or price fixing, and the conspiracy alleged herein is illegal under the Sherman Act.

**D.  Defendants' Collusive Conduct**

46. Defendants have conspired to fix, raise, maintain and/or stabilize prices for Hawaiian Ocean Shipping.

47. A major feature of Defendants' conspiracy has been to share capacity on each other's ships. Defendants' capacity sharing arrangement allows each carrier to transport cargo on its competitor's ships at preferential rates. Without this collusion and capacity sharing arrangement, defendants would have had to add additional vessels to their routes in order to carry their customers' cargo, which would result in more capacity, more frequent service, and lower prices. The capacity sharing arrangement was the functional equivalent of two duopolists acting like a monopoly. A study published by the United States Department of Transportation's Maritime Administration in May 2006 explicitly equated excess capacity with competition by stating, ". . . competitive downward pressure on freight rates may result from overcapacity."

48. In August 2001, Horizon (then CSX Lines) began shipping on Matson's midweek sailing from Los Angeles, eventually withdrawing its own bi-weekly service. Horizon advertises this mid-week sailing as its "mid-week express." Less regularly, Matson also ships containers on Horizon's sailings when Matson's own sailings are full.

49. Another feature of the trade has been parallel, identical, and near simultaneous imposition of fuel surcharges. Fuel surcharges are a separate component of the cost to ship cargo that is supposed to assist the carrier to recover fuel costs. Matson and Horizon justify their fuel

9
CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

surcharges by claiming that the surcharges are necessary to offset the increases in fuel costs. In a truly competitive market, the imposition of a fuel surcharge by a carrier that exceeds the actual cost of fuel consumed should create competition from others. The more fuel efficient operator should finds ways to capture cargo from the less fuel efficient operator, and pricing would be one of those ways. Here, however, Defendants chose not to price compete, and a plausible explanation for that lack of competition in this duopoly is that Defendants were conspiring. Horizon itself acknowledged the lack of competition in a February 1, 2008 press release, which states "we were able to generate net income and earnings per share" based in part on "a stable rate environment in all three of our offshore markets."

50. Matson and Horizon have imposed identical fuel surcharges during the Class Period. They both introduced fuel surcharges for the first time in October 1999. Both liners charged the same fuel surcharge - 1.75 percent of revenue. Since then, each liner has adjusted fuel surcharges 27 times - each adjustment occurred within days of the competitor's adjustment and for the same amount. The following chart illustrates defendants' lockstep behavior:

**Hawaiian Ocean Shipping Rate Increases March 2004 - March 2008**
**Matson Navigation Company, Inc. and Horizon Lines, Inc.**

| Company | Date of Announcement | Effective Date | Fuel Surcharge Increase/ Decrease | Per Container Fee Increase | Terminal Handling Fee Increase (Per Container |
|---|---|---|---|---|---|
| Matson Navigation | 3/1/2004 | 3/14/2004 | 7.5 to 8% | | |
| Horizon Lines | Unknown | Approx. 3/2004 | 7.5 to 8% | | |
| Matson Navigation | Approx. 6/2004 | 6/2004 | 8 to 8.8% | | |
| Horizon Lines | 6/2004 | 6/2004 | 8 to 8.8% | | |
| Matson Navigation | 10/8/2004 | 10/18/2004 | 8.8 to 9.2% | | |
| Horizon Lines | 10/8/2004 | 10/18/2004 | 8.8 to 9.2% | | |
| Horizon Lines | 9/7/2005 | 9/15/2005 | 11.5 to 14% | | |

10
CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

| | | | | | |
|---|---|---|---|---|---|
| Matson Navigation | 9/9/2005 | 10/2/2005 | 11.5 to 13% | | |
| Matson Navigation | 11/10/2005 | 1/1/2006 | | $125/Westbound $75/Eastbound Approx. 3.9% | $60/Westbound $30/Eastbound Approx. 22% |
| *Horizon Lines* | 11/29/2005 | 1/2/2006 | | $125/Westbound $75/Eastbound | $60/Westbound $30/Eastbound |
| Matson Navigation | 12/9/2005 | 1/1/2006 | 13 to 15% | | |
| *Horizon Lines* | 12/15/2005 | 1/2/2006 | 13 to 15% | | |
| Matson Navigation | 3/10/2006 | 4/2/2006 | 15 to 18.5% | | |
| *Horizon Lines* | Unknown | Approx. 4/2006 | 15 to 18.5% | | |
| Matson Navigation | 5/12/2006 | 6/4/2006 | 18.5 to 21.25% | | |
| *Horizon Lines* | 5/23/2006 | 6/5/2006 | 18.5 to 21.25% | | |
| Matson Navigation | 9/21/2006 | 10/1/2006 | 21.25 to 19.75% | | |
| *Horizon Lines* | 9/26/2006 | 10/2/2006 | 21.25 to 19.75% | | |
| Matson Navigation | 10/17/2006 | 11/25/2006 | 19.75 to 18.75% | | |
| *Horizon Lines* | 10/22/2006 | 11/6/2006 | 19.75 to 18.75% | | |
| Matson Navigation | 11/17/2006 | 1/1/2007 | | $100/Westbound $50/Eastbound Approx. 3.3% | $150/Westbound $75/Eastbound Approx. 45-46% |
| *Horizon Lines* | 11/22/2006 | 1/1/2007 | | $100/Westbound No Eastbound data | $150/Westbound $75/Eastbound Approx. 45-46% |
| Matson Navigation | 1/22/2007 | 1/28/2007 | 18.75 to 17.5% | | |
| *Horizon Lines* | 1/24/2007 | 1/29/2007 | 18.75 to 17.5% | | |
| Matson Navigation | 2/21/2007 | 3/11/2007 | 17.5 to 19.5% | | |
| *Horizon Lines* | 2/23/2007 | 3/11/2007 | 17.5 to 19.5% | | |
| *Horizon Lines* | 4/18/2007 | 5/6/2007 | 19.5 to 20.75% | | |

11

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

| | | | | | |
|---|---|---|---|---|---|
| Matson Navigation | 4/21/2007 | 5/6/2007 | 19.5 to 20.75% | | |
| Matson Navigation | 5/16/2007 | 5/27/2007 | 20.75 to 22.5% | | |
| Horizon Lines | 5/17/2007 | 5/27/2007 | 20.75 to 22.5% | | |
| Matson Navigation | 7/20/2007 | 8/19/2007 | 22.5 to 24% | | |
| Horizon Lines | 7/26/2007 | 8/20/2007 | 22.5 to 24% | | |
| Horizon Lines | 10/16/2007 | 11/11/2007 | 24 to 25% | | |
| Matson Navigation | 10/22/2007 | 12/2/2007 | 24 to 26% | | |
| Matson Navigation | 11/13/2007 | 12/14/2007 | 26 to 29% | | |
| Horizon Lines | 11/20/2007 | 12/17/2007 | 25 to 29% | | |
| Horizon Lines | 12/26/2007 | 2/4/2008 | 29 to 32% | | |
| Matson Navigation | 1/4/2008 | 2/4/2008 | 29 to 31.5% | | |
| Matson Navigation | 3/11/2008 | 4/6/2008 | 31.5 to 33.5% | | |
| Horizon Lines | 3/12/2008 | 4/7/2008 | 32 to 33.5% | | |

51. Although Matson and Horizon claimed that these fuel surcharges were necessary to recoup increased costs, the surcharges did not reflect actual fuel cost increases. Fuel costs among ocean liners vary significantly due to a number of unique factors, such as differences in vessels and fuel efficiency, different routes, the use of hedging, and individual fuel conservation efforts. It is highly unlikely, if not impossible, that Matson and Horizon incurred identical fuel expense increases. Furthermore, the revenue generated by the fuel surcharges depends on the underlying revenues generated, which varies between the two carriers. Thus, there is no way that these fuel surcharges only raised enough additional revenue to cover the increased costs that each carrier experienced.

52. In addition to the lockstep fuel surcharge increases, Matson and Horizon have acted

in lockstep on other matters as well. In the spring of 2006, Matson announced that it would make surcharge changes whenever it deemed necessary, rather than on a quarterly basis as had been its prior practice. Shortly thereafter, Horizon changed its longstanding policy and announced it would adjust fuel surcharges "in a more timely manner."

53. Defendants' lockstep pattern was broken for the first time in May, 2008. On May 9, 2008, Horizon announced that it would raise its fuel surcharge from 33.75 percent to 35.25, percent, effective June 8. On May 19, 2008, Matson announced that it would maintain its fuel surcharge at the existing 33.75 percent level. Two days later, on May 21, Horizon announced it would not implement the previously announced increase and would instead keep the fuel surcharge at the existing rate. This break in the over 8-year pattern is significant because it occurred only after the United States Department of Justice ("DOJ") announced an investigation into the "domestic ocean carriage" industry.

E. **Government Investigation**

54. On April 17, 2008, it was disclosed that the DOJ is investigating "domestic ocean carriage." The same day, Defendant Horizon Lines, Inc. acknowledged that federal agents served warrants and a grand jury subpoena on the company in connection with that investigation. Defendant Alexander & Baldwin, Inc. confirmed that it was preparing to receive a DOJ subpoena related to "domestic ocean carriage." Significantly, Alexander & Matson, Inc.'s domestic shipping trade is limited to trade between the continental United States and Hawaii and Guam. In a quarterly report filed with the United States Securities and Exchange Commission on May 2, 2008, Alexander & Baldwin stated that "Matson understands that while the investigation currently is focused on the Puerto Rico trade, *it also includes pricing practices in connection with all domestic trades*, including the Alaska, *Hawaii*, and Guam trades." (Emphasis added).

55. To obtain the search warrants executed upon Defendants, the United States had to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a

13
CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence had to have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or by testimony, must be grounded on reasonably trustworthy information.

## VIII.  FRAUDULENT CONCEALMENT

56. Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to April 17, 2008, when it was revealed that the DOJ was investigating "domestic ocean carriage."

57. Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations including.

58. As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by Plaintiff and the members of the Class.

## IX.  CAUSE OF ACTION

59. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

60. Beginning at least four years ago and continuing to the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Hawaiian Ocean Shipping in the United States, and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

61. Defendants' unlawful conduct resulted in artificially high prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Class for Hawaiian Ocean Shipping.

62. Plaintiff and members of the Class had to pay more for Hawaiian Ocean Shipping than they would have paid in a competitive marketplace.

63. Plaintiff seeks to recover for these overcharge damages.

64. As a direct and proximate result of Defendants' scheme, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined. Plaintiff's injuries consist of paying higher prices to purchase Hawaiian Ocean Shipping than she would have paid absent Defendants; conduct. Plaintiff's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B. That the contract, combination or conspiracy, and the acts done in furtherance thereof by defendants and their co conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

C. That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

D. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

    (1) continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2) communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of any product except to the extent necessary in connection with a bona fide sales transactions between the parties to such communications.

E. That Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all the claims asserted in this Complaint so triable.

DATED: July 29, 2008

Respectfully Submitted,

/s/ Craig Corbitt

Francis O. Scarpulla (Bar No. 41059)
Craig C. Corbitt (Bar No. 83251)
Patrick B. Clayton (Bar No. 240191)
ZELLE, HOFMANN, VOELBEL, MASON &
 GETTE LLP
44 Montgomery Street – Suite 3400
San Francisco, CA 94104
Telephone:   (415) 693-0700
Facsimile:    (415) 693-0770
Email:         fscarpulla@zelle.com
                ccorbitt@zelle.com
                pclayton@zelle.com

W. Timothy Needham (Bar No. 96542)
JANSSEN, MALLOY, NEEDHAM, MORRISON,
 REINHOLTSEN, CROWLEY & GRIEGO, LLP
730 Fifth Street
P.O. Drawer 1288
Eureka, CA 95502
Telephone:   (707) 445-2071
Facsimile:    (707) 445-8305
Email:         tneedham@janssenlaw.com

[Additional Counsel on Following Page]

Michael P. Lehmann (Bar No. 77152)
Christopher L. Lebsock (Bar No. 184546)
Jon T. King (Bar No. 205073)
Arthur N. Bailey (Bar No. 248460)
COHEN, MILSTEIN, HAUSFELD & TOLL,
 P.L.L.C.
One Embarcadero Center – Suite 2440
San Francisco, CA 94111
Telephone:  (415) 229-2080
Facsimile:  (415) 986-3643
Email:  mlehmann@cmht.com
        clebsock@cmht.com
        jking@cmht.com
        abailey@cmht.com

*Attorneys for Plaintiff and the Proposed Class*

---

17

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL